
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

|  |  |
|---|---|
| FRIENDS OF ANIMALS,<br><br>               Plaintiff,<br><br>vs.<br><br>JAMES SPARKS, in his official capacity as Billings Field Officer Manager; THE UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>               Defendants. | CV 15-59-BLG-SPW<br><br><br>ORDER |

Plaintiffs Friends of Animals ("FOA") filed this action on June 26, 2015, to stop a planned round-up of wild horses scheduled for August 3, 2015, at the Pryor Mountain Wild Horse Range ("the Horse Range"). FOA argued that the planned gather violated the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. § 1331 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 et seq.

Given the impending gather, FOA moved for preliminary injunctive relief on July 10, 2015. (Doc. 11). Following briefing and a hearing on FOA's motion, the Court found that FOA was unlikely to succeed on the merits of its claim and issued

1

a written order denying the request for injunctive relief. (Doc. 18). On August 20, 2015, this Court issued a scheduling order in this matter. (Doc. 21). In accordance with the deadlines in that order, Defendants filed the administrative record on September 28, 2015. (Doc. 23). Defendants supplemented the administrative record on November 20, 2015. (Doc. 24). FOA filed its motion for summary judgment on December 18, 2015, (Doc. 27), and Defendants filed their cross-motion for summary judgment on January 29, 2016. (Doc. 35).

As set forth below, the Court will grant in part FOA's motion for summary judgment, and deny in part the government's motion for summary judgment, and set aside BLM's decision. Because the arguments made by the parties are very similar to the arguments made in connection with the earlier request for injunctive relief, this Order closely follows the Court's previous July 30, 2015, order.

## I. Legal Framework

### A. National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370, "the broadest and perhaps most important of federal environmental legislation," was enacted to protect the environment by requiring that a federal agency "consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Earth Island Inst. v. U.S.*

*Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002). The policy behind NEPA is to ensure that an agency has at its disposal all relevant information about environmental impacts of a project before the agency embarks on the project. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994). It is also intended to assure that the evidence on which an agency bases its decision is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Accordingly, NEPA "ensure[s] a process, not [] any result." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998). NEPA does not set out substantive environmental standards, but instead establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences. *Metcalf v. Daley*, 214 F.3d 1135, 1141-42 (9th Cir. 2000) (quoting *Robertson*, 490 U.S. at 348). Under these procedures, an agency must identify those actions which normally require an environmental impact statement ("EIS"). *See* 40 C.F.R. § 1501.4(a)(1). In order to determine whether a particular proposed action requires the preparation of an EIS, agencies perform an environmental assessment ("EA").

An EA is a public document (shorter than an EIS) that contains information pertaining to the need for the proposed action, other alternatives, the environmental

3

impact of the proposal and its alternatives, and other relevant information. *See* 40 C.F.R. § 1501.4 (Council on Environmental Quality ("CEQ") regulations implementing NEPA); *Metcalf*, 214 F.3d at 1142.

An agency may prepare an EA for one of several reasons: (1) to provide evidence and analysis that establish whether or not an EIS or a Finding of No Significant Impact ("FONSI") should be prepared; (2) to help the agency comply with NEPA when no EIS is necessary; and (3) to facilitate preparation of an EIS when one is necessary. *See* 40 C.F.R. § 1508.9(a).

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This "alternatives provision" applies whether an agency is preparing an EIS or an EA and requires the agency to give full and meaningful consideration to all reasonable alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005). However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id.*at 1246. When an agency prepares an EIS, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), while in an EA, an agency "only is required to include a brief discussion of reasonable alternatives." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d

1147, 1153 (9th Cir. 2008) (citing 40 C.F.R. § 1508.9(b)). NEPA does not require federal agencies to assess, consider and respond to public comments on an EA to the same degree as it does for an EIS. *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1073 (9th Cir. 2014).

Because NEPA is essentially a procedural statute, judicial "review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs,* 524 F.3d 938, 947 (9th Cir. 2008). "An agency's decision can be set aside only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Earth Island Institute*, 697 F.3d at 1013.

## B.   The Wild Horse Act

Congress passed the Wild Horse Act, Pub. L. No. 92–195, 85 Stat. 649 (1971), to protect wild free-roaming horses from "capture, branding, harassment, or death." 16 U.S.C. § 1331; *see also Kleppe v. New Mexico*, 426 U.S. 529, 535–36 (1976) (citing legislative history). The Act grants the Secretary of the Interior

jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to manage them "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

Section 1333(a) provides that "[t]he Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands" and that "[a]ll management activities shall be at the minimal feasible level ... in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species." *Id.* The BLM uses localized "herd management areas" ("HMAs"), *id.* § 1332(c); 43 C.F.R. § 4710.3–1, established in accordance with broader land use plans, to carry out this plan. *Id.* § 4710.1.

As the Secretary's delegate, the BLM manages the wild horses in accordance with 16 U.S.C. 1333, et seq. Accordingly, BLM must maintain a current inventory of wild horses so that it can "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels [("AML")] of wild free-roaming horses [] on these areas of public lands; and determine whether appropriate management levels should be achieved by the removal or destruction

of excess animals, or other options (such as sterilization, or natural controls on population levels)." *Id.* § 1333(b)(1).

The BLM defines the AML as "the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." *In Def. of Animals,* 751 F.3d at 1072. The Ninth Circuit describes the AML as "a vehicle used [by the BLM] to move towards a thriving natural ecological balance by which the BLM is alerted to address population imbalance." *Id.*

When the BLM determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," the Wild Horse Act requires the BLM to "immediately remove excess animals from the range so as to achieve the [AML]." 16 U.S.C. § 1333(b)(2). The term "excess animals" is defined as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f). Before taking such action, the BLM prepares a detailed "gather" plan, including a NEPA compliant EA. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,* 460 F.3d 13, 16 (D.C. Cir. 2006).

## II.    Factual Background

This case arises from the BLM's 2015 decision to remove excess horses from the Horse Range, which spreads over 38,000 acres in Montana and Wyoming. As part of its management obligations, BLM issued a herd management area plan ("HMAP") in 1984 establishing an AML for the Horse Range at 115-127 wild horses. (Doc. 24 at BLM002717). In 1992, the BLM modified the 1984 HMAP and reestablished the AML at 85 to 105 wild horses. (*Id.* at BLM002718, BLM002721). The 1992 HMAP governed wild horse management in the Horse Range until 2009. (*Id.* at BLM002718). BLM's objective during this period was to manage for a slight upward trend in range health. (*Id.*)

In 2004, the National Resource Conservation Service (NRCS) completed a survey and assessment of the Horse Range. (*Id.* at BLM002717). According to the survey and assessment, the horses were affecting the land and management practices needed adjusting. (*Id.*) This prompted the BLM to evaluate the Horse Range and analyze data points to determine if it was meeting its management objectives and rangeland health standards. (*Id*; *see also* 2008 Horse Range Evaluation Doc. 11-8, 1-86). Based on its evaluation, the NRCS Survey and Assessment, and public comments, BLM determined that it needed to shift its focus from trying to improve the range condition to managing for stabilization of the ecological conditions. (Doc. 24 at BLM002717). This new management

objective included "maximizing the number of wild horses" that BLM could managed on the range. (*Id.*)

In its evaluation, BLM noted that for the past several years, the wild horse population on the range had substantially exceeded the then-existing AML of 85-105. (*Id.* at BLM002784). BLM determined that increasing the AML would "result in a higher level of genetic exchange and variation," and that realigning the population with the new AML would assist in regaining management objectives. (*Id.* at BLM002783-84). BLM issued the Pryor Mountain Wild Horse Range/Territory EA and HMAP ("2009 EA") which authorized an increase in the AML to 90 to 120 horses. (*Id.* at BLM002715). In the 2009 Record of Decision ("ROD"), BLM stated that, "[m]onitoring data will continue to be collected and the AML will be recalculated within five years or after the revision to the Billings RMP [Resource Management Plan], whichever comes first." (*Id.* at BLM002722).

In 2012, BLM conducted another wild horse gather. BLM tracked the range's forage utilization rate, noting that it was closer to meeting the management objectives when the horse populations were kept at the established AML of 90-120 horses. (*See id.* at BLM003212). Based on that determination, in its 2012 Non-Helicopter Gather EA ("2012 EA"), BLM reaffirmed the AML established during the 2009 EA/HMAP process. (*See id.*)

BLM monitored the horse population in 2013, 2014, and 2015. (*Id.* at BLM000017). In 2015, BLM's monitoring data showed that use levels were closer to the objective in 2010 and 2013 when the wild horse population was closer to the 2009 AML. (*Id.* at BLM000017). According to BLM, "this data reaffirm[ed] the current AML as determined in the 2009 EA." (*Id.*) BLM again determined that the range's population of 170 horses was "beyond the capacity of the range in order to protect it from deterioration," and that measures were needed to protect the range from deterioration. (*Id.*) BLM again reaffirmed the AML because utilization levels were closer to the objective when wild horse population was closer to the AML. (*See id.*) BLM noted that even with the use of fertility control, heavy and severe use of vegetation was occurring. (*Id.* at BLM000018). BLM stated the proposed action would "help protect rangelands from deterioration from an overpopulation of wild horses and help maintain a thriving natural ecological balance and multiple use relationships." (*Id*).

Accordingly, BLM drafted the 2015 PMWHR Bait/Water Trapping Gather Preliminary EA, considering three alternative management actions: (1) a "no action" plan where it would conduct only fertility control but take no other action; (2) its proposed action of gathering twenty-five (25) horses in addition to fertility control; and (3) "Alternative A," introduced based on public comments proposing smaller, incremental gathers. (*Id.* at BLM000023-25).

BLM stated its purpose for the 2015 Proposed Action "[was] to help meet the goals and objectives of the [2009 HMAP] by helping to maintain the wild horse AML. . . . The [2009] HMAP identified the AML at 90-120 wild horses as the carrying capacity in order to maintain ecological stability of the range and protect the range from deterioration. The Proposed Action and Alternative in th[e 2015] EA is needed to help maintain wild horse herd numbers at levels consistent with the AML, to make progress toward standards of rangeland health and to achieve objectives and decisions authorized in the 2009 EA and HMAP." (*Id.* at BLM000020).

After considering public comments and the EA's analysis, BLM decided to implement Alternative A and issued its Decision Record, Finding Of No Significant Impact and Final Environmental Assessment ("2015 EA") on June 16, 2015. (*Id.* at BLM000003). Under that action, BLM would gather fifteen (15) to twenty (20) horses in the summer of 2015, and monitor the effects of fertility control and other management activities in determining the need for future gathers. (*Id.* at BLM000023-25).

## III. Judicial review of agency action occurs under the APA

Because neither NEPA nor the Wild Horse Act contains provisions allowing a private right of action, *see Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990), a party can obtain judicial review of alleged violations of those acts

only under the waiver of sovereign immunity contained within the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Under the APA, the court must determine if the agency action was "arbitrary and capricious," outside the scope of the agency's statutory authority, or otherwise not in accordance with the law. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994). An agency's action is arbitrary and capricious if it fails to consider important aspects of the issues before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law. *The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency. *Lands Council v. McNair,* 629 F.3d 1070, 1074 (9th Cir. 2010). Although the scope of review for agency action is limited, agency action is not unimpeachable. The reviewing court must determine whether there is a rational connection between the facts and resulting judgment so as to support the agency's determination. *Baltimore Gas and Elec. v. NRDC*, 462 U.S. 87, 105-06 (1983).

To be reviewable under the APA, the agency action at issue must be "final." To be a "final agency action," the challenged agency action must represent the consummation of the agency's decision making process. *Oregon Natural Desert*

*Ass'n v. United States Forest Service*, 465 F.3d 977, 984 (9th Cir. 2006); *see also Bennett v. Spear*, 520 U.S. 154 (1997) (final agency action is an action "from which legal consequences will flow.") The action "must not be of a merely tentative or interlocutory nature." *Id.* Rather, the court must look to see whether the agency has "rendered its last word on the matter" to determine whether an action is "final and ripe for judicial review." *Id.*

## IV.   Discussion

FOA first argues that the AML on which BLM relied for its 2015 Removal Decision had expired. As a result, FOA contends that BLM's excess animal determination, which was premised in part on the AML, was wrong, thereby rendering BLM's gather decision arbitrary and capricious under the Wild Horse Act. (Doc. 28 at 14-15). BLM admits that it relied on the 2009 AML, in part, to make its excess animal determination, but that its reliance was proper because the promise to recalculate the 2009 AML was made in a land use plan, which BLM is not obligated to follow. (Doc. 40 at 3). BLM also argues that it made its excess determination based on a number of factors, not just the AML. (Doc. 36 at 23-25).

Because it is undisputed that BLM relied on the 2009 AML when making its "excess" wild horse determination, the Court must determine whether BLM's reliance on the 2009 AML to make the "excess" animal determination for the 2015 gather was contrary to governing law.

## A.    The 2009 AML

FOA argues that BLM committed in its 2009 Record of Decision to recalculate the AML before the 2015 Removal Decision. (Doc. 24 at BLM002722). Because BLM did not meet this commitment, FOA argues that the AML the BLM used to establish the existence of "excess animals" for the 2015 gather decision was outdated and therefore invalid. BLM argues that the 2009 AML was not outdated because (1) BLM reaffirmed the AML in 2012, (2) nothing in the Wild Horse Act requires it to recalculate the AML prior to each gather decision, and (3) it was not bound to its commitment in the 2009 ROD to recalculate the AML within five years because the commitment was made in a land use plan. The Court addresses these arguments in turn.

### i.    Reaffirming the AML is not the same as recalculating the AML.

BLM argues that its failure to recalculate the 2009 AML before 2015 is absolved because it reaffirmed the 2009 AML in its 2012 EA and its 2015 EA. (Doc. 36 at 18). In the 2009 ROD, however, BLM stated "the AML will be *recalculated* within five years or after the revision to the Billings RMP whichever comes first." (Doc. 24 at BLM002722) (emphasis added).  BLM's handbook does not specifically distinguish between "reaffirming" and "recalculating" the AML. BLM's handbook does note, however, that a separate decision process is required to establish or adjust an AML:

> "AML is not generally established or adjusted as part of the gather planning (NEPA) process due to the in-depth and complex nature of the analysis required. . . . If the authorized officer elects to formally review AML as part of the same environmental document which evaluates the proposed removal, the AML decision should be separated from the gather/removal decision. This may be accomplished by issuing separate Decision Records[.]"

(Doc. 11-12, *BLM Wild Horses and Burros Handbook*, H-4700 (July 2010), 18, 47). According to the handbook, establishing or adjusting the AML is a "multi-tiered analysis process" that desires a minimum of three to five years data. (*Id.* at 18, 67). BLM documents the results of this analysis in an HMA Evaluation Report which is provided to the public for a 30 day review and comment period. (*Id.* at 75). In comparison, reaffirming or re-evaluating the AML occurs "when review of resource monitoring and population inventory data indicates the AML may no longer be appropriate." (*Id.* at 18.) No separate record of decision is necessary. (*Id.*)

BLM conceded during oral argument that establishing or adjusting the AML is equivalent to recalculating the AML, and is a much more involved process than reaffirming the AML. BLM explained that compared to recalculation, which requires more rigorous, in-depth evaluation of intensive monitoring data or land health assessment, reaffirming the AML considers less information over a shorter period of time. BLM also conceded at oral argument that it reaffirmed, and did not recalculate, the 2009 AML prior to its 2015 decision. Accordingly, in the event

BLM is bound to its commitment in the 2009 ROD to recalculate the AML, simply

reaffirming the 2009 AML in 2012 and 2015 did not absolve BLM of its duty to

recalculate the AML.

### ii. The AML is not outdated under the Wild Horse Act

Next, BLM argues that it was not required to recalculate the 2009 AML

under the Wild Horse Act. (Doc. 36 at 18). BLM is correct. *See In Def. of

Animals*, 751 F.3d at 1064 (nothing in the Act requires the BLM to determine new

AMLs based on current conditions every time the BLM decides to take action to

restore the already-established AMLs). Importantly, however, FOA relies on the

2009 ROD and BLM's commitment to recalculate the AML contained therein to

support its contention that BLM relied on an outdated AML, not the Wild Horse

Act.

### iii. The AML is outdated because the 2009 Record of Decision committed BLM to recalculating the 2009 AML by 2014.

As noted above, BLM stated in its 2009 ROD that it would recalculate the

2009 AML within five years. The Court finds that federal regulations, case law,

and its own representations to the public bind BLM to this commitment.

The Code of Federal Regulations requires the BLM to follow through with

the commitments it makes in a record of decision. *See* 40 C.F.R. § 1505.3

("Mitigation *and other conditions* established in the environmental impact

statement or during its review and committed as part of the decision *shall* be

implemented by the lead agency or other appropriate consenting agency.")
(Emphasis added). "Regulations promulgated by administrative bodies . . . are
usually given the force and effect of statutory law." K. Davis, Administrative Law
Treatise § 7.13 (1979). This specifically includes Records of Decision. *See* e.g.,
*Forty Most Asked Questions Concerning CEQ's National Environmental Policy
Act Regulations*, 46 FR 18026-01 (Mar. 17, 1981) (CEQ statement that "the terms
of a Record of Decision are enforceable by agencies and private parties" and that a
"Record of Decision can be used to compel compliance with or execution of the
mitigation measures identified therein.").

Other courts that have analyzed this question agree that under § 1505.3, an
agency is bound to the commitments it makes in the ROD. *See also Lee v. U.S. Air
Force*, 220 F. Supp. 2d 1229, 1236 (D.N.M. 2002), *aff'd*, 354 F.3d 1229 (10th Cir.
2004) (agencies are "legally bound" by decision document and were "obligated" to
act as promised under 40 C.F.R. 1505.3 and are "subject to all recourse
contemplated by federal law and . . . regulations" for failure to comply); *see also
Sierra Club v. Jacobs*, 2005 WL 6247793 at *7 (S.D. Tex., September 30, 2005)
(any mitigation measures set out in an environmental impact statement are
"directly binding" on Forest Service pursuant to 40 C.F.R. 1505.3); *Tyler v.
Cisneros*, 136 F.3d 603, 308 (9th Cir. 1998) (agency must comply with mitigation
measures agreed to by agency in NEPA review process).

Perhaps most importantly, the BLM represents to the public that it

must comply with the decisions and commitments it makes in an ROD.

BLM's website (specifically its "NEPA Web Guide")[1] currently states that:

> "Pursuant to generally recognized principles of federal administrative
> law, agencies will be held accountable for preparing Records of
> Decision that conform to the decisions actually made and for carrying
> out the actions set forth in the Records of Decision. This is based on
> the principle that an agency must comply with its own decisions and
> regulations once they are adopted. Thus, *the terms of a Record of
> Decision are enforceable* by agencies and private parties. A Record
> of Decision can be used to compel compliance with or execution of
> the mitigation measures identified therein."

*NEPA Web Guide*, CEQ 40 FAQs: Questions 30-40, http://www.blm.gov

/wo/st/en/prog/planning/nepa/webguide/40_most_asked_questions/questions

_30-40.html (last accessed July 20, 2016) (emphasis added). BLM also

states in its NEPA Handbook:

> The decision record on an EA may also impose requirements for
> mitigation and related monitoring and enforcement activities.
> Monitoring activities which are adopted in a decision record must be
> implemented as specified.

*BLM NEPA Manual*, Handbook H-1790-1, 102, 105 (January 2008).

BLM argues that the commitment to recalculate the 2009 AML was made in

the 2009 Herd Management Area Plan, a land use plan, so under *Norton v.*

---

[1] The Court takes judicial notice of BLM's public website. Fed. R. Evid.
201(b),(c); *see also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D.
Cal. 2014).

*Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) (*SUWA*), BLM was not bound to the commitment. BLM maintains that *SUWA* held that ordinarily the goals set out in BLM management plans are not binding commitments that the agency can be forced to follow via the APA's grant of authority to the court to "compel action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

In *SUWA* the Court explained that, "land use plans are a preliminary step in the overall process of managing public lands . . . [and are] not the ordinary medium for affirmative decisions that implement the agency's projections." 542 U.S. at 56. Because a land use plan is generally a statement of priorities, guiding and constraining actions as opposed to prescribing them, agencies are not typically legally bound to the projections of agency action contained therein. *Id.* Under most circumstances agencies "issue management decisions to implement land use plans – the decisions, that is, are distinct from the plan itself." *Id.* at 69; *see also Stout v. U.S. Forest Service*, 869 F.Supp.2d 1271, 1280 (D. Or. 2012) (finding that a standard which left a measure of discretion to the United States Forest Service in determining how to manage livestock was not a "clear indication of a binding commitment.")

Here, as a threshold matter, *SUWA* interprets claims brought under 5 U.S.C § 706(1), but FOA seeks relief under § 706(2)(A). In *SUWA* the plaintiffs were

seeking to compel agency action which they asserted was "unlawfully withheld or unreasonably delayed." 542 U.S. at 62-63. Here, BLM has taken a final agency action which is independently reviewable under a separate section of the APA requiring the court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The analysis in *SUWA* does not apply to § 706(2)(A) claims.

BLM argues that FOA's cause of action under § 706(2)(A) is really an attempt to compel agency action by making an end run around § 706(1)'s statute of limitations. The court disagrees. As FOA noted in oral argument, FOA did not dispute the 2009 ROD or BLM's commitment therein to recalculate the AML within five years. So, FOA had no interest in challenging the 2009 ROD because FOA agreed with the action. FOA's current action is appropriate under § 706(2)(A), because FOA argues that BLM acted in contradiction with the 2009 ROD when it went ahead with the 2015 Gather Plan before recalculating the AML. Accordingly, FOA's § 706(2)(A) claim is proper and *SUWA* does not apply.

Second, according to the administrative record before this Court, the phrase, "the AML will be recalculated within five years or after the revision to the Billings RMP, whichever comes first" is found in the Finding of No Significant Impact and Decision Record for the Pryor Mountain Wild Horse Range 2009 Gather Plan and

Environmental Assessment (EA). BLM002722. The commitment was plainly made in the decision record, not the land use plan, so again, *SUWA* lacks any application here.

Even if *SUWA* did apply, however, the Court finds that BLM is still bound to its commitment to recalculate the AML within five years. In *SUWA*, the Court was reviewing an action brought by environmental plaintiffs who sought to compel the BLM to better manage wilderness study areas in compliance with goals set out in the land use plan for that area. 542 U.S. 55. The Court made it clear that although broad statutory mandates are unenforceable under § 706(1) of the APA, language in a plan creating a commitment binding on the agency is a different matter. *Id.* at 71. The Court explained that to enforce broad statutory measures would interfere with agency discretion by substituting the judgment of the court with that of the expert agency. *Id.* An agency action specifically called for in a plan could be compelled, however "when language in the plan itself creates a commitment binding on the agency." *Id.* at 71.

Here, even assuming BLM's 2009 commitment to recalculate the AML within five years was found in the land use plan, the commitment cannot be construed as a broad statutory mandate. The commitment language specifies that, "the AML will be re-calculated within five years or after the revision to the Billings RMP whichever comes first." BLM-002722. If this language does not

constitute a commitment, then no language would suffice. BLM recalculated the AML for the Wild Horse Range only once between 1985 and 2009. In 2009, BLM revamped the applicable land use plan and apparently made a concerted decision to recalculate the 2009 AML within five years of that revision, presumably to see how the revisions impacted the range. It seems clear that BLM went out of its way to make clear it was committing to a certain process, not simply restating broad statutory mandates. Withdrawing from that commitment seems to violate § 706(1) under *SUWA*.

In summary, according to federal regulation, case law interpreting the same, and BLM's representations to the public, the Court finds that BLM made a binding commitment in the 2009 ROD to recalculate the 2009 AML within five years. BLM's failure to adhere to this commitment is a violation of process prohibited by NEPA. *See* 40 C.F.R. 1505.3; *Tyler,* 136 F.3d at 608 (agency must comply with measures agreed to by agency in NEPA review process). Accordingly, the 2009 AML is outdated per the 2009 ROD.

## B. Because the AML was outdated, BLM's excess horse determination under the Wild Horse Act was arbitrary and capricious.

FOA argues that since the AML was no longer valid, BLM's reliance on it for the 2015 Removal Decision was flawed. Specifically, FOA points out that BLM stated that the purpose of its 2015 Gather was to "maintain the 2009 wild

horse AML." (Doc. 28 at 18, quoting BLM000020). BLM argues that it evaluated the AML in 2012 and 2015. (Doc. 40 at 2). BLM also argues that its reliance on the AML was minimal for determining the existence of excess animals on the range. (Doc. 40 at 6). As explained below, because BLM failed to recalculate the 2009 AML as required under NEPA, the 2009 AML was outdated and BLM's reliance upon it to make its "excess horse" determination, which formed the basis for the 2015 Removal Decision, was arbitrary and capricious.

The relevant statute, § 16 U.S.C. § 1332(f)(2), requires that an "excess animals," determination be made through the use of AML levels. *In Def. of Animals*, 751 F.3d at 1063 (quoting 16 U.S.C. § 1333(b)(2) (if "an overpopulation exists," and if the BLM determines that "action is necessary to remove excess animals," the BLM "shall immediately remove excess animals from the range *so as to achieve appropriate management levels*.") (emphasis in original). The statute also provides that "[s]uch action shall be taken ... until all excess animals have been removed so as to restore a thriving natural ecological balance." *Id.* In *In Def. of Animals*, the Ninth Circuit held that the most logical reading of those two phrases together is that the BLM must achieve a "thriving natural ecological balance" by maintaining the relevant AMLs. § 1333(b)(2). The Court explained, "[i]n this way, AML is a vehicle used to move towards a thriving natural ecological balance, and a trigger by which the BLM is alerted to address

population imbalance." *Id.* (citing *In Defense of Animals*, 909 F.Supp.2d at 1192) (internal quotations omitted).

Here, BLM failed to maintain the relevant AML when it failed to follow its own commitment to recalculate the 2009 AML within five years. By operating with an outdated AML when it made its 2015 decision, BLM's excess animal determination was based, at least in part, on pure guesswork. Regardless of BLM's reliance on range information, BLM had no accurate AML off of which to work. Without an accurate AML, BLM's duty to remove could not be triggered because BLM could not properly determine that an overpopulation existed, which is the prerequisite for removal. *See In Def. of Animals*, 751 F.3d at 1063 (distinguishing *Colorado Wild Horse and Burro Coalition v. Salazar*, 639 F.Supp.2d 87 (D.D.C.2009), where the BLM did not have the authority to remove horses because it had not established an overpopulation existed and had not established the appropriate AML).

Accordingly, BLM's reliance on an outdated AML in making the "excess horse" determination that formed the basis for its 2015 Removal Decision was arbitrary and capricious. Therefore, the Court grants summary judgment to FOA on this claim.

## C. NEPA violations

FOA argues that BLM violated NEPA by (1) failing to consider the impact of the 2015 Removal Decision on the genetic health of the Pryor Mountain wild horse population, and (2) by failing to adequately consider known alternatives to roundup and removal.

### i. Genetic impacts

FOA argues that BLM failed to consider the effects of the gather on the wild horses' genetic diversity and simply copied its analysis from the 2012 EA. (Doc. 28 at 20). According to BLM, the findings in the 2010 and 2013 genetic reports it relied upon were substantially similar but, ultimately both reports showed genetic variability measures above average. (Doc. 36 at 27). FOA argues that BLM failed to analyze Dr. Gus Cothran's most recent assessment of the genetic health of the herd and "disregarded the reasonable opinion of its own expert" without explanation. (Doc. 37 at 10). The record demonstrates otherwise.

According to the EA, BLM found Dr. Cothran's report "lacking information about the herd demographics and kinship," because it was based on a small (seven horses) selection of horses that were related (mothers and siblings). (Doc. 24 at 000022). BLM determined that the Pryor Mountain Wild Mustang Center's information on kinship and lineage was more accurate with respect to lineage. (*Id.* at 7, 37) Not only does BLM have "the discretion to rely on the reasonable

opinion of its own experts," *In Def. of Animals*, 737 F. Supp. 2d at 1137, even the

"most recent report on genetics of the Pryor Mountain wild horses" provided by

FOA fails to refute the BLM's determinations that loss of genetic material is

minimal. (*See* Doc 24 at 000022, 000045, Gus Cothran, *Genetic Analysis of the*

*Pryor Mountain Wild Horse Range, MT* (2013) (stating "*He* is slightly higher than

*Ho* which *could* indicate the very beginning evidence of inbreeding. *However, the*

*difference at this point is not statistically significant.*) (emphasis added). BLM is

entitled to "particular deference with respect to scientific issues within [its] area of

expertise. *In Def. of Animals*, 737 F. Supp. 2d at 1137. Even if BLM cut and pasted

its genetic analysis from the 2012 EA to the 2015 EA because the determination

was the same, FOA has not provided the Court with any evidence that the analysis

has changed or is otherwise incorrect.

FOA also argues that Dr. Cothran recommends increasing the herd size to

ensure genetic viability, but fails to acknowledge that even Dr. Cothran suggests

doing so only when the range conditions allow it. (Doc. 11-10 at 5). The 2015 EA

states the range conditions do not allow it.

By tiering to the 2009 EA, BLM incorporated the population management

actions to ensure maximum genetic variation. Further, BLM's proposed adaptive

management to monitor and mitigate the effects of management actions on genetic

diversity in the 2015 EA demonstrates reasoned decision making. Because BLM

took a hard look at the genetic impacts of the gather, BLM's actions were not arbitrary and capricious.

## ii.    Alternatives

FOA argues that BLM violated NEPA by failing to consider viable alternatives to the August gather. Specifically, FOA argues that BLM did not consider "reasonable" alternatives to the removal including: "(1) allowing the horses to roam free on public lands with no roundup or removal actions and no fertility control; (2) adjusting current AMLs; and/or (3) expanding the herd management area to more adequately reflect the needs of a healthy self-sustaining population." (Doc. 19 at 28).

### a.    No action alternative

BLM argues that it considered FOA's first alternative, but after appropriate consideration it reasonably rejected the alternative. (Doc. 36 at 24). The record supports BLM's argument. In a brief summary, BLM explained that it looked seriously at the alternative but determined that without population management through fertility treatment and gathers, the horses would be allowed to exhaust all resources, multiple use relationships would be ignored, and the horses' numbers would increase until a population crash occurred. (Doc. 24 at BLM000025). BLM's response was reasonable and adequate. *See Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010) (holding that if an agency opts not to

make changes, it must, at least explain why the comments do not warrant further response citing [ ] reasons which support the agency's position.) In fact, BLM need not have considered this alternative at all because it does not advance the purpose of the project. *See Friends of Se. Future v. Morrison*, 153 F.3d at 1247. As Congress realized in 1978, failing to manage the wild horses does not help maintain the wild horse AML or benefit the land. Accordingly, the Court grants summary judgment to BLM on this claim.

### b. Recalculating the AML

Next, FOA argues that BLM failed to consider recalculating the AML as an alternative. Specifically, FOA argues that BLM failed to offer "reliable data or support for its decision to rely on the outdated AML" and failed to "consider reevaluating the AML." (Doc. 37 at 8). BLM contends that FOA ignores evidence in the record that BLM reevaluated the AML in 2012 and 2015. (Doc. 40 at 9). BLM states "[e]ven though BLM had not considered reevaluating the AML as a specific alternative, BLM gave due consideration to the AML." (*Id.*).

Although NEPA does not require the BLM to "consider every possible alternative to a proposed action, nor [] alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives," BLM cannot fail to consider an alternative more consistent with its policy objectives than the other alternatives it considered. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*,

177 F.3d 800, 813 (9th Cir. 1999) (holding that the Forest Service should have considered alternatives "more consistent with [the agency's] basic policy objectives than the alternatives that were the subject of final consideration.")

Here, BLM adequately considered the alternative of expanding the range and the no alternative action, yet it failed to discuss reevaluating the AML altogether. This is troubling because, as noted above, BLM made a specific commitment to recalculate the AML before 2015 in its 2009 ROD. Obviously reevaluating or recalculating the AML was consistent with the agency's basic policy objectives because in 2009 BLM committed to doing just that. Yet, BLM did not bother to discuss this fact or its reasoning for ignoring this commitment when it rejected this alternative. By failing to give any meaningful consideration to the fact that BLM had committed to recalculating the 2009 AML within five years, presumably for a particular reason, and instead rejecting reevaluating the AML out of hand, BLM acted arbitrarily and capriciously. Accordingly, the Court grants summary judgment to FOA on this claim.

### c.     Expanding the Herd Management Area

Finally, FOA argues that the BLM failed to consider expanding the Herd Management Area or provide an explanation for why the alternative was not a reasonable one. (Doc. 28 at 23). BLM explained that it did not address comments about expanding the Horse Range because they were "outside the scope of the

analysis" of the EA. (Doc. 36 at 33 (quoting Doc. 24 at BLM000045)). At least two district courts in this circuit have determined that where a proposed action would result in a change in the scope of resource uses, the change must occur through a Resource Management Plan amendment, not an EA. *See Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 125 (D.D.C. 2013); *Cloud Found. v. BLM*, 802 F. Supp. 2d 1192, 1206-07 (D. Nev. 2011). Here, as in those cases, range expansion onto National Forest System lands raises numerous conflicts with other BLM management goals. Suggesting the range be expanded to some unknown area is not a reasonable alternative, so the BLM was not required to consider it. Accordingly, the Court grants summary judgment to BLM on this claim.

## V.     Conclusion

FOA's motion for summary judgment (Doc. 28), and BLM's motion for summary judgment (Doc. 35) are granted in part and denied in part. FOA shall prepare an appropriate Judgment consistent with this Opinion, and after conferring with counsel for BLM, shall submit it to the Court for signature.

IT IS SO ORDERED.

DATED this 29th day of July, 2015.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge